Case No. 13-2379

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## NANCY A. HARRISON

*Plaintiff-Appellant,*

*v.*

## WELLS FARGO BANK, N.A.

### And

## WELLS FARGO & COMPANY DISABILITY PLAN

*Defendants-Appellees.*

On Appeal From The United States District Court
For The Eastern District Of Virginia
Richmond Division

### APPELLEES' RESPONSE BRIEF

**DANA L. RUST**
**(VSB No. 28408)**
**SUMMER L. SPEIGHT**
**(VSB No. 80957)**
**McGuireWoods LLP**
**901 East Cary Street**
**Richmond, Virginia 23219**
**(804) 775-1000**
**(804) 775-1061 (facsimile)**
*Counsel for Appellees*
*Wells Fargo Bank, N.A. &*
*Wells Fargo & Company Disability Plan*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-2379      Caption: Harrison v. Wells Fargo Bank, N.A., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Wells Fargo Bank, N.A.
(name of party/amicus)


who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations? ☑ YES ☐ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
     Wells Fargo & Company

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☑ YES ☐ NO
     If yes, identify all such owners:
     Wells Fargo & Company

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
       If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
       If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Summer Speight           Date:   November 25, 2013

Counsel for: Appellees

## CERTIFICATE OF SERVICE

**************************

I certify that on   November 25, 2013   the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Richard F. Hawkins, III
The Hawkins Law Firm, PC
2222 Monument Avenue
Richmond, VA 23220
rhawkins@thehawkinslawfirm.net
(804)308-3040

/s/ Summer L. Speight                 11/25/2013
      (signature)                         (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-2379        Caption: Harrison v. Wells Fargo Bank, N.A., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Wells Fargo & Company Short-Term Disability Plan
(name of party/amicus)

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                          ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☑ YES ☐ NO
   If yes, identify entity and nature of interest:

   Wells Fargo & Company is the Plan Sponsor and Plan Administrator for the Wells Fargo & Company Short-Term Disability Plan.

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
   If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Summer Speight _____     Date: ___November 25, 2013___

Counsel for: Appellees _____

## CERTIFICATE OF SERVICE
****************************

I certify that on __November 25, 2013__ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Richard F. Hawkins, III
The Hawkins Law Firm, PC
2222 Monument Avenue
Richmond, VA 23220
rhawkins@thehawkinslawfirm.net
(804)308-3040

___/s/ Summer L. Speight_____                    ___11/25/2013_____
(signature)                                             (date)

- 2 -

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ iii

I.      STATEMENT OF THE ISSUES ................................................ 1

II.     STATEMENT OF THE CASE ................................................... 2

III.    STATEMENT OF THE FACTS ................................................. 5

      A.     Background on Harrison's Employment and the Plan ........................ 5

      B.     Harrison's Medically Certified Health Condition and Recovery ........ 7

      C.     Liberty Life Denies Harrison Short-Term Disability Benefits
          After September 10, 2011 Because She Could Perform the
          Essential Functions of Her Job ........................................ 10

      D.     Harrison Failed to Demonstrate in Her First-Level Appeal that
          She Was Entitled to Continued Short-Term Disability Benefits ....... 12

      E.     Harrison Failed to Demonstrate on Her Second-Level Appeal
          that She Was Entitled to Continued Short-Term Disability
          Benefits ............................................................... 17

IV.     STANDARD OF REVIEW ...................................................... 21

V.      SUMMARY OF THE ARGUMENT ........................................... 22

VI.     ARGUMENT ........................................................................ 24

      A.     The Denial Decision is Supported by the Plan Language ................. 25

      B.     The Denial Decision Furthers the Purposes and Goals of the
          Plan .................................................................... 28

      C.     The Materials Considered by Liberty Life and Wells Fargo
          Were Adequate and Supported the Denial Decision ...................... 29

          1.    The Medical Records Supported the Denial Decision ............ 29

          2.    Wells Fargo Properly Considered and Weighed the
             Opinions of Harrison's Treating Physician ............................. 32

          3.    Wells Fargo Properly Considered and Weighed
             Statements from Harrison and Her Sister ............................... 33

i

4.    The Reports from the Independent Peer Reviewers Provide Further Support for Wells Fargo's Denial Decision ................................................................. 34

5.    Wells Fargo's Review Cannot Be Rendered Inadequate Simply Because Harrison Failed to Avail Herself of the Opportunity to Provide Records from Dr. Glenn .................... 38

D.    The Decision-Making Process Was Reasoned and Principled .......... 44

E.    The Decision Was Consistent with the Procedural and Substantive Requirements of ERISA ................................ 46

F.    Any Conflict of Interest Had No Effect on the Decision .................. 48

VII.    CONCLUSION ................................................................ 49

REQUEST FOR ORAL ARGUMENT ................................................ 50

CERTIFICATE OF COMPLIANCE ................................................ 51

CERTIFICATE OF SERVICE ........................................................ 52

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abromitis v. Cont'l Cas. Co./CAN Ins. Cos.*, 114 F. App'x 57
(4th Cir. 2004) ................................................................ 37

*Benson v. Hartford Life & Accident Ins. Co.*, 511 F. App'x 680
(10th Cir. 2013) .............................................................. 42

*Bernstein v. CapitalCare, Inc.*, 70 F.3d 783 (4th Cir. 1995) ................................. 22

*Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003 (4th Cir. 1985), *abrogated on
other grounds by Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101
(1989) ..................................................................... 23, 41

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003)................. 32, 37, 38

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*,
201 F.3d 335 (4th Cir. 2000)...................................................... passim

*Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461 (9th Cir. 1997)................. 43

*Brogan v. Holland*, 105 F.3d 158 (4th Cir. 1997)............................................. 21, 46

*Davis v. Unum Life Ins. Co*, 444 F.3d 569 (7th Cir. 2006) ..................................... 45

*Donnell v. Metropolitan Life Ins. Co.*, 165 F. App'x 288 (4th Cir. 2006).............. 44

*Elliott v. Sara Lee Corp.*, 190 F.3d 601 (4th Cir. 1999) ............................. 21, 23, 40

*Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228 (4th Cir. 1997), *abrogated
in part on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S.
105 (2008) ................................................................ passim

*Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315
(4th Cir. 2008) ............................................................ 21, 37, 45

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989)................................. 21

*Fortier v. Principal Life Ins. Co.*, 666 F.3d 231 (4th Cir. 2012) ........................... 49

*Frankton v. Metro. Life Ins. Co.*, 432 F. App'x 210 (4th Cir. 2011) ................ 38, 45

*Gable v. Sweetheart Cup Co.*, 35 F.3d 851 (4th Cir. 1994) ..................................... 26

*Gaither v. Aetna Life Insurance Company* 394 F.3d 792
    (10th Cir. 2004) ................................................................. 23, 24, 41, 42

*Hale v. Broadspire Servs.*, 232 F. App'x 278 (4th Cir. 2007) .......................... 38, 45

*Harden v. Am. Express Fin. Corp.*, 384 F.3d 498 (8th Cir. 2004) .......................... 43

*Hensley v. Int'l Bus. Machines Corp.*, 123 F. App'x 534 (4th Cir. 2004) ........ 26, 44

*Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534 (9th Cir. 1990) ...................... 44

*Laws v. Celebrezze*, 368 F.2d 640 (4th Cir. 1966) .................................................. 22

*LeFebre v. Westinghouse Elec. Corp. Mgmt. Disability Benefits Plan*, 747
    F.2d 197 (4th Cir. 1984), *overruled by implication on other grounds by*
    *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003) .................. 23, 41

*Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823 (7th
    Cir. 2009) ........................................................................................ 31

*Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) ...................................... 48

*Meyer v. Life Ins. Co. of N. Am.*, No. 08-10-HRW, 2009 U.S. Dist. LEXIS
    8586 (E.D. Ky. Feb. 5, 2009) ........................................................... 36

*Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472 (7th Cir. 1998) .............. 44

*Rizzi v. Hartford Life & Accident Ins. Co.*, 383 F. App'x 738 (10th Cir.
    2010) .................................................................................................. 42

*Schnur v. CTC Cmmc'ns Corp. Grp. Disability Plan*, No. 05 Civ. 3297
    (RJS), 2010 U.S. Dist. LEXIS 31282 (S.D.N.Y. Mar. 29, 2010), *aff'd*,
    413 F. App'x 377 (2d Cir. 2011) ...................................................... 36

*Scott v. Eaton Corp. Long Term Disability Plan*, 454 F. App'x 154
    (4th Cir. 2011) ...................................................................... 33, 37, 45

*Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090
    (C.D. Cal. 2009), *aff'd*, 409 F. App'x 99 (9th Cir. 2010) .................. 36

*Spry v. Eaton Corp. Long Term Disability Plan*, 326 F. App'x 674
    (4th Cir. 2009) ................................................................... 38, 45

iv

*Tickle v. Long Term Disability Plan of Marathon Ashland Petroleum*,
    34 F. App'x 909 (4th Cir. 2002) ............................................................ 32

*Trottier v. CNA Grp. Life Assurance*, No. 03-544-SM, 2004 U.S. Dist.
    LEXIS 23927 (D.N.H. Nov. 29, 2004) .............................................. 36

*Tuttle v. CIGNA Grp. Ins.*, Cause No. 1:10cv202-LG-RHW, 2012 U.S. Dist.
    LEXIS 47500 (S.D. Miss. Apr. 4, 2012) ........................................... 36

*Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622 (4th Cir. 2010) ................... 48

**OTHER AUTHORITIES**

29 C.F.R. § 2560.503-1(g)(1)(iii) .................................................... 46, 47, 48

# I. STATEMENT OF THE ISSUES

1. Whether the District Court erred in holding that Appellee Wells Fargo & Company Short-Term Disability Plan[1] (the "Plan" or "Wells Fargo") had not abused its discretion when it found that Appellant Nancy A. Harrison ("Harrison") was able to return to her sedentary job between two surgeries which transpired in August and October 2011 and, therefore, was no longer entitled to short-term disability benefits, where its decision was made after a thorough review by a nurse case manager and two board-certified experts, and two separate administrative appeals.

2. Whether the District Court erred in ruling that Wells Fargo's denial of benefits was procedurally reasonable, where the Plan places the burden on Harrison to prove her disability with clinical evidence, and the Plan gave Harrison multiple opportunities to submit such evidence, she knew that the administrators did not have any psychological records to support her claim of mental disability, she was specifically instructed that she needed to submit documents from all of her treating physicians, but she failed to submit any psychological records in support of her claim.

---

[1] Although the Complaint and Notice of Appeal named Wells Fargo and Company Disability Plan as Defendant-Appellee, the official name of the plan at issue is the Wells Fargo & Company Short-Term Disability Plan.

## II. STATEMENT OF THE CASE

Harrison received short-term disability benefits under the Plan from June 9, 2011 through September 10, 2011. During this time period, Harrison was receiving treatment for a thyroid condition. On August 17, 2011, Harrison underwent a successfully thyroidectomy, which has a two-week recovery period.

On September 7, 2011, three weeks following her operation, her surgeon released Harrison to her primary care physician for follow-up as needed. Harrison's surgeon noted that her condition had improved, that she was doing well, and that she suffered from no post-operative complications. He did not list any restrictions or limitations that would prevent her from returning to her sedentary job.

Harrison was denied benefits after September 10, 2011 because Wells Fargo determined that she had recovered from her thyroidectomy, was able to work in her sedentary position of Online Customer Service Representative and therefore failed to establish a continued disability as required under the Plan. Wells Fargo reached this conclusion after conducting a complete review of Harrison's eligibility for disability benefits, which included a comprehensive review of her medical records, statements from Harrison, her sister and assessments from her doctors, reviews performed by a nurse case manager, and two separate independent peer reviews performed by board-certified doctors.

Following the initial denial of benefits, Harrison advised that she suffered from depression, anxiety and post-traumatic stress disorder ("PTSD") preventing her from returning to work. The claims administrator informed Harrison that it lacked records to support a mental or emotional impairment and instructed her to submit those records on appeal.

After receiving an appeal letter from Harrison, the claims administrator contacted her to inquire whether she provided the additional information she wanted considered on appeal. Harrison informed the claims administrator that medical records were forthcoming, including records from all of her treatment providers. After receiving medical records, the claims administrator again contacted Harrison to verify that she had submitted all the records she wanted considered on appeal. While the records submitted showed that Harrison would be seeing a psychologist at some point in the future, Harrison failed to provide any documents or statements from this psychologist. The claims administrator denied her first-level appeal because the records again demonstrated that Harrison could perform the essential functions of her job.

Harrison appealed this decision and, once again, Harrison was provided with the opportunity to submit records or statements supporting her alleged mental or emotional impairment during the second-level appeal. She failed to submit any documents from her psychologist and instead asserted that her primary care

3

physician, not her psychologist, had excused her from work because of her mental and emotional problems. Her primary care physician contradicted this assertion, deferring to the psychologist. Wells Fargo denied her second-level appeal, after referring her claim to two board-certified independent peer reviewers, because the records once again demonstrated that Harrison could perform the essential functions of her job.

Harrison filed a lawsuit challenging the denial of short-term disability benefits after September 10, 2011. (Joint Appendix (hereinafter "J.A.") at 11.)[2] Wells Fargo filed for summary judgment,[3] and on November 8, 2013, the District Court granted Wells Fargo's motion, holding that Wells Fargo did not abuse its discretion in denying Harrison short-term disability benefits. (J.A. at 553-54, 564.) Additionally, the District Court rejected Harrison's argument that Wells Fargo's decision was procedurally unreasonable because it failed to take additional steps to obtain Harrison's psychological records after she had failed to furnish them as requested. (J.A. at 557-59.)

_____

[2] Harrison's Complaint named the Plan as well as Wells Fargo Bank, N.A., her employer, as Defendants. Appellees argued on summary judgment that Wells Fargo Bank, N.A. is not a proper party because it is neither the Plan nor the Plan Administrator. (J.A. at 544 n.1.) Harrison now appears to concede that Wells Fargo Bank, N.A. is not a proper party. (Appellant's Opening Brief at 5 n.6.)
[3] Harrison did not file a cross-motion for summary judgment. Accordingly, her request that this Court enter summary judgment in her favor is procedurally improper. (Appellant's Opening Brief at 55.)

4

### III.  STATEMENT OF THE FACTS

A.    **Background on Harrison's Employment and the Plan**

Harrison began her employment with Wells Fargo in October 2008 as an Online Customer Service Representative.  (J.A. at 27.)  In this role, she was "[r]esponsible for assisting customers with a wide range of inquiries related to online financial products and services."  (J.A. at 202.)  Her primary duties included processing online transactions and resolving customer issues regarding the platform or software operating systems for online products.  (J.A. at 202.)  The Online Customer Service Representative position is a sedentary job, involving mostly sitting, keying, and mouse use.  (J.A. at 204.)

By virtue of her employment with Wells Fargo, Harrison was eligible to participate in the Plan, which was established by Wells Fargo & Company to provide employees "with salary replacement if [they] had a medically certified health condition and are unable to perform some or all of [their] job duties for more than seven consecutive calendar days."  (J.A. at 477.)

The Plan is an employee welfare benefit plan within the meaning of ERISA. (J.A. at 477.)  Wells Fargo & Company is the Plan Sponsor and Plan Administrator.  (J.A. at 504.)  The Plan is self-insured and benefits are paid for by Wells Fargo & Company through a trust.  (J.A. at 472-73.)  Under the terms of the Plan, Wells Fargo & Company has full discretionary authority to administer and

interpret the terms and provisions of the Plan and may delegate its duties and discretionary authority to certain designated personnel and third parties. (J.A. at 504.) Claims under the Plan are administered by Liberty Life Assurance Company of Boston ("Liberty Life"). (J.A. at 437, 477.)

To qualify for short-term disability benefits under the Plan, a Participant must have a "medically certified health condition" that lasts longer than seven days and prevents the Participant from performing the essential duties of his or her job. (J.A. at 480.) The Plan defines a "medically certified health condition" as a disabling injury or illness that:

- Is documented by clinical evidence as provided and certified by an approved care provider. Clinical evidence may include medical records, medical test results, physical therapy notes, mental health records, and prescription records.

- <u>Prevents you from performing the essential functions of your own job</u> as regularly scheduled for longer than the STD waiting period.

(J.A. at 480 (emphasis added).) Thus, to obtain benefits, Participants must have a documented condition which prevents them from performing essential functions of their job, and those benefits cease when the Participant no longer has a medically certified health condition preventing him or her from doing so. (J.A. at 477, 480.)

The Plan explicitly places the burden on the Participant to provide medical documentation for review on appeal. It states that it is the Participant's responsibility to "include any medical documentation that you would like to be

6

considered in the denial review." (J.A. at 485.) It further provides: "It is very important that you submit all of the information you want reviewed when your appeal is filed." (J.A. at 486.)

Short-term disability benefits may last for a total of 26 weeks under the Plan. (J.A. at 484.) Thereafter, eligible Participants can apply for long-term disability benefits. If the Participant has developed a different or recurring condition while on an approved leave, he or she may seek additional short-term disability benefits for the newly-developed condition. (J.A. at 478-80, 482, 484.)

**B.     Harrison's Medically Certified Health Condition and Recovery**

On May 12, 2011, while still working for Wells Fargo, Harrison saw her primary care physician, Dr. Mark Petrizzi, to discuss her weight and the possibility of gastric bypass surgery. (J.A. at 99-100.) This appointment also served as a follow-up to a recent visit to the emergency room for chest pains, during which a chest x-ray revealed a mass over Harrison's heart. (Id.) During this office visit with Dr. Petrizzi, Harrison did <u>not</u> complain of chest pain, pressure, or tightness, and her mental status exam was normal. (Id.) Dr. Petrizzi scheduled a CT of her chest. (Id.) The CT showed an enlarged thyroid. (J.A. at 69.)

Harrison continued to work and saw Dr. Petrizzi again on May 19, 2011 to discuss the results of additional procedures. (J.A. at 104-05.) A nuclear med scan was normal, but the ultrasound revealed a multi-nodular goiter. (Id.) Harrison

7

again had no complaints of chest pain, pressure, or tightness, and her mental status exam was again normal. (Id.)

Harrison's last day of work at Wells Fargo was June 8, 2011. (J.A. at 27.) Harrison underwent a diagnostic bronchoscopy on June 9, 2011. (J.A. at 195.) Harrison visited Dr. Petrizzi the next day to discuss the results of the procedure. (J.A. at 187-88.) Consistent with her prior visits, Harrison did not complain of chest pain, pressure, or tightness, and her mental status exam was normal. (Id.)

Harrison had a follow-up appointment with Dr. Petrizzi on June 15, 2011. During this visit, Harrison complained of a cough, sneeze, and fever, but not chest pain, pressure, or tightness, and her mental status exam was normal. (J.A. at 189-91.) Harrison wanted, however, to apply for short-term disability benefits. (Id.) Dr. Petrizzi noted that he wanted to keep Harrison out of work until after the surgery for her thyroid condition. (Id.) That same day, Dr. Petrizzi listed Harrison's "Limitations" as "Will need to remain out of work until surgery is complete." (J.A. at 192.) Importantly, Harrison stated that her potential return to work date would be two weeks post-operation. (J.A. at 41.) This is the standard recovery period for thyroid surgery. (J.A. at 402.)

Harrison saw Dr. Daniel VanHimbergen, an ear, nose and throat ("ENT") doctor, on June 21, 2011 to schedule a thyroidectomy. (J.A. at 193-94.) Dr. VanHimbergen noted that Harrison had a multi-nodular goiter. (Id.) A biopsy

taken during the bronchoscopy confirmed that the mass consisted of thyroid tissue. (Id.) Harrison complained of some airway symptoms and difficulty swallowing. (Id.) They scheduled the surgery for August 17, 2011. (J.A. at 37.)

Harrison sought treatment for depression from Dr. Petrizzi on August 4, 2011. (J.A. at 111-13.) This depression had <u>no</u> relationship to her thyroid issues. Harrison described her depression as a variable lack of joy and happiness associated with the recent death of her husband. (Id.) However, her mental status exam was normal. (Id.) Harrison also complained of sudden and recurring chest pain in the substernal area during this visit. (Id.) She described the pain as being precipitated by deep breaths. (Id.) Her electrocardiogram showed normal sinus rhythms and no acute changes. (Id.) Harrison declined additional diagnostic procedures relating to her complaint of chest pain. (Id.)

Harrison underwent a successful thyroidectomy on August 17, 2011. (J.A. at 171-73.) Office notes from Harrison's post-operative visit with Dr. VanHimbergen on August 23, 2011, a week after her surgery, show that Harrison was "[d]oing well" and had no post-operative complications. (J.A. at 148-49.) Harrison's symptoms had improved compared to her pre-operative symptoms, but she continued to complain of some chest pain and shortness of breath. (Id.) Harrison had some additional tissue that was not removed in the August 17th surgery. (J.A. at 148.) Dr. VanHimbergen instructed Harrison to follow-up with

9

an endocrinologist, with the hope that her residual tissue could be treated medically and without further surgery.  (J.A. at 64, 148-49.)

At her next appointment on September 7, 2011, three weeks after her surgery, Dr. VanHimbergen again noted that Harrison's symptoms had improved, that she was "doing well," that she had no post-operative complications, and that she had scheduled an appointment with an endocrinologist.  (J.A. at 150-51.)  He released Harrison to her primary care physician as needed without any job-related restrictions or limitations.  (Id.)

Harrison saw Dr. Petrizzi on September 9, 2011.  (J.A. at 142-43.)  Dr. Petrizzi did not note any complaints from Harrison about chest pain, tightness, shortness of breath, depression, or anxiety.  (Id.)  He did instruct Harrison to perform at-home physical therapy for a minor shoulder pain that had developed after the surgery.  (Id.)  Dr. Petrizzi did not schedule any follow-up appointment and did not provide Harrison with any job-related limitations or restrictions.  (Id.)

### C.    Liberty Life Denies Harrison Short-Term Disability Benefits After September 10, 2011 Because She Could Perform the Essential Functions of Her Job

The Plan granted Harrison short-term disability benefits from when she first left work through September 10, 2011.  (J.A. at 27, 164-65.)  This was ten days more than the standard two-week recovery period for a thyroidectomy, which is what Harrison had proposed as her return to work date.  (J.A. at 41.)

10

Harrison challenges her denial of short-term disability benefits after September 10, 2011. She had a second operation on October 31, 2011, which required her to miss additional time. The narrow issue in this case is whether Wells Fargo properly concluded that Harrison could return to work between the two surgeries, and it was proper, therefore, for it to deny her short-term disability benefits during this time period.

After Dr. VanHimbergen released Harrison to her primary care physician, Liberty Life referred her claim to a nurse case manager ("NCM") for review to determine if the medical records showed that Harrison could not perform her sedentary job. (J.A. at 33, 138-40.) The NCM observed that Harrison's surgeon had released her to her primary care physician and that Harrison had no post-operative complications. (Id.) The NCM recommended restrictions based on Harrison's minor right shoulder pain for approximately two weeks, but these restrictions did not impact her ability to perform her job. (J.A. at 33.)

On September 16, 2011, Liberty Life informed Harrison that it had completed a thorough review of her eligibility for short-term disability benefits and had determined that benefits would not be paid after September 10, 2011 because she had recovered from her surgery and was under no restrictions or limitations that would prevent her from performing her sedentary job. (J.A. at 138-40.) Liberty Life cited the Plan's definition for disability, listed the medical

11

documentation considered, and explained the reasoning for the denial. (Id.)
Liberty Life reviewed her medical records and compared Harrison's restrictions
and limitations to the requirements of Harrison's job. *Id.* Liberty Life explained
its decision to Harrison as follows:

> Your job as an Online Customer Service Representative I requires that
> you constantly sit, and perform repetitive fine manipulations with the
> keyboard and mouse; occasionally push and pull your chair and desk
> drawer; with seldom walking, bending and twisting of the neck and
> waist. Based on the medical information in relation to your job
> requirements you no longer meet your plan's definition of having a
> medically certified health condition, and we must close your claim.
> Benefits will be paid through September 10, 2011 and your claim is
> closed as of September 11, 2011.

(J.A at 139.) Liberty Life also explained that Harrison could seek review of the
denial and instructed that any request for review should include:

> all documentation, such as hospital records, discharge summaries,
> exam findings, operative reports, office visit notes, diagnostic test
> results, chiropractic notes, physical therapy notes, orthopedic notes,
> endocrinology notes, referrals, consultations, restrictions, limitations,
> treatment plans, and any other medical information from all treating
> providers, which you feel will support your claim for continued
> benefits.

(J.A. at 139-40 (emphasis added).)

### D. Harrison Failed to Demonstrate in Her First-Level Appeal that She Was Entitled to Continued Short-Term Disability Benefits

Harrison did not claim depression, anxiety or PTSD as a potential basis for a
disability finding until after she was informed during a phone call of Liberty Life's
initial denial decision. (J.A. at 32.) Liberty Life expressly informed Harrison in

12

this call there were no records to support any mental or emotional impairment, but she could submit any additional medical documentation on appeal. (Id.)

Harrison appealed the denial of short-term disability benefits, claiming continued disability based on chest pain, her minor right shoulder pain, and her depression, anxiety, and PTSD. (J.A. at 134.) Harrison also stated that she would need a second surgery at some point in the future to remove the remaining mass, requiring four to six weeks recovery time. (Id.)

In her appeal submitted on October 18, 2011, Harrison wrote that she was unable to drive or focus due to her chest pain, that she sporadically experienced numbness in her arm and fingers, and she was unable to work because of emotional trauma. (J.A. at 134.) Harrison also noted that she had an upcoming appointment with a psychologist, Dr. Glenn, to see if he could help her. (Id.) It does not appear from her October appeal or Dr. Petrizzi's office notes that she had even seen Dr. Glenn yet. (J.A. 123, 137.) Notably, Dr. Petrizzi's medical records differ from Harrison's appeal in that they did not contain any restrictions on her driving and did not mention any complaints about experiencing numbness or an inability to focus.

Upon receipt of Harrison's appeal letter, Liberty Life called Harrison to determine whether she had provided all relevant information for review on appeal, and Harrison informed Liberty Life that more information would be forthcoming.

13

(J.A. at 31.)  Liberty Life asked whether it would include medical documentation

for <u>all</u> of Harrison's health providers "as the more info the better and it seems she

has a lot of [doctors] and [conditions]."  (Id.)  Harrison responded that she

understood and would ensure that "all info is sent over."  (Id.)  A few days later,

Liberty Life received medical records from Harrison and verified with her that it

now had all the information needed to process the appeal.  (Id.)

The additional medical records submitted along with her appeal did not

include any medical records, letters or statements from Dr. Glenn and, again, it was

unclear if she had even seen him yet.  The records did include office notes from

Dr. Petrizzi dated October 5, 2011, about a month following her September 9, 2011

post-operative visit.  (J.A. at 121-23.)  These office notes show that Harrison saw

Dr. Petrizzi for the following reason:

> Patient words:  PT needs updated STD forms; PT states her
> STD has been denied because of the wording of our last form filled
> out—she will also need[] a written letter from us explaining why she
> should not have been denied; explaining her current medical
> conditions.

(J.A. at 121.)  During this office visit, Harrison complained of chest pain and

discomfort, as well as anxiety due to her medical condition and the recent loss of

her husband.  (J.A. at 121-23.)  Harrison did not complain of any continued right

shoulder pain.  (Id.)  Additionally, her mental status exam was normal.  (Id.)  Dr.

Petrizzi noted that, as expressly requested by Harrison, he would write a letter in

14

support of Harrison's disability claim, and he referred Harrison to a psychologist, Dr. Glenn, for her anxiety. (J.A. at 123.)

The next day, Dr. Petrizzi authored the promised letter, stating: "While Mrs. Harrison's job requires desk work, she still conti[n]ues to have chest pain despite recent thyroid surgery. She has continued difficultly with most activities. She now, has developed significant anxiety, and will be seeing a local psychologist. All these issues have resulted in her inability to return to work." (J.A. at 137.) He did not submit any accompanying medical evidence or further explain his opinion. Dr. Petrizzi also did not describe what activities she had difficulty with or provide any specific restrictions or limitations.

Liberty Life again referred Harrison's claim to a NCM for review to determine whether the additional documents submitted supported ongoing restrictions and limitations preventing Harrison from performing her job. (J.A. at 29-30.) A review of the medical records showed:

1) a normal heart rhythm test;

2) a normal chest scan with surgery scheduled for the thyroid nodule;

3) no further work-ups for reported chest pain;

4) no further complaints of right shoulder issues as of October 5, 2011;

5) normal mental status exam findings; and

15

6) normal physical and nervous findings.

(Id.)  The NCM concluded that the medical information submitted did not

corroborate Dr. Petrizzi's October 6, 2011 letter.  (Id.)

On November 28, 2011, Liberty Life affirmed its prior decision finding that

the medical evidence did not support ongoing impairment.  (J.A. at 92-94.)  Liberty

Life again cited the Plan's definition for disability, described the medical records

received for review, and explained the reasoning for Liberty Life's denial as

follows:

> Based on a thorough review of the available medical information, the
> records do not contain physical or mental status exam findings,
> diagnostic test results, evidence of a marked or prolonged
> deterioration, or other medical documentation substantiating that your
> symptoms were of such severity that they resulted in restrictions and
> limitations rendering you unable to perform the essential duties of
> your job. . . .  In the absence of clinical evidence that supports a level
> of impairment that would have prevented you from performing the
> duties of your job, you do not meet the definition of disability as
> stated in the Wells Fargo & Company Short Term Disability Plan.
> Therefore, we are unable to alter our original determination and no
> benefits are payable beyond September 10, 2011.

(J.A. at 93 (emphasis added).)[4]  Liberty Life informed Harrison of her right to

appeal the denial to Wells Fargo & Company and the right to submit additional

information or comments deemed pertinent for review on appeal.  (J.A. at 93-94.)

---

[4] Harrison notes that this denial of her first-level appeal refers mistakenly to
Harrison as a "Mortgage Consultant."  (J.A. at 93.)  This is clearly a typographical
error.  The initial denial decision discusses Harrison's job as an Online Customer
Service Representative I.  (J.A. at 139.)  Additionally, the administrative record

### E.    Harrison Failed to Demonstrate on Her Second-Level Appeal that She Was Entitled to Continued Short-Term Disability Benefits

Harrison appealed the denial of continued short-term disability benefits to Wells Fargo. (J.A. at 58-60, 404.) In her appeal letter, Harrison describes her recovery and restrictions following an October 31, 2011 median sternotomy, a surgery that occurred about two-and-a-half months after her thyroidectomy and a month-and-a-half after her benefits were denied. (J.A. at 59.) She also states that Dr. Petrizzi referred her to a psychologist, Dr. Glenn, and that "Dr. Petrizzi has advised [her] not to return to work until [she] ha[s] processed [her] grief, can control [her] anxiety attacks, and have controlled the PTSD." (J.A. at 59.) Harrison did not claim that Dr. Glenn had excused her from work.

Harrison also submitted a letter from her sister;[5] a letter from Dr. Darius Hollings, her Thoracic Surgeon; medical documentation from Dr. Hollings;[6] and a

---

contains only one job description—that for an Online Customer Service Representative. (J.A. at 202-04.)

[5] The letter from Harrison's sister states that she had to "feed [Harrison], dress her, wash her hair, put her shoes and socks on, give her medications, provide physical therapy for her arm, and drive her around." (J.A. at 61.) Contrary to Harrison's assertion that she could not drive due to sporadic chest pain, Harrison's sister contends that she was unable to drive to due to medications. (Id.) The letter does not explain when she had to assist Harrison with these functions or why Harrison was unable to perform these functions by herself. Additionally, Harrison's medical records contain no restrictions or limitations preventing Harrison from performing such functions.

[6] The letter and medical records submitted by Dr. Hollings related to the median sternotomy performed on October 31, 2011, over a month-and-a-half after

letter from Dr. Petrizzi along with her appeal. (J.A. at 61-72.) Harrison did not submit any records or documents from her psychologist.

Wells Fargo arranged for an independent peer review of Harrison's file by a physician specializing in internal medicine, Dr. Dan Gerstenblitt, a Board Certified Doctor in Internal Medicine, to determine if the medical records supported impairment beyond September 10, 2011. (J.A. at 48-49, 399-403.) Dr. Gerstenblitt attempted to contact Dr. Petrizzi for a peer-to-peer consultation on multiple occasions without a response. (J.A. at 401-02.) Dr. Gerstenblitt described in detail the medical records he reviewed, <u>including letters submitted by Harrison and her sister</u>. (J.A. 399-401.) After reviewing Harrison's file, Dr. Gerstenblitt determined the following:

> [Harrison] underwent a thyroidectomy from an ENT doctor on August 17, 2011. However, by September 7, 2011, or three weeks postoperatively, it appeared that the ENT physician only indicated follow up [when necessary]. Evidence based guidelines recommend a return to clerical work by 14 days postoperatively from a thyroidectomy via official disability guidelines, and to manual work 21 to 28 days. Therefore, there is nothing really in the records to indicate that she could not have returned to a sedentary type of occupation, in which, per Dr. Petrizzi's note of October 6, 2011, her job required. <u>She should have been able to go back to work as of September 8, 2011.</u>
>
> The fact that the patient had chest pain is not a reason necessarily to be unable to work. . . .

Harrison's recovery from the thyroidectomy. (J.A. at 64-65.) They are not, therefore, relevant to this case.

> The patient then went on to have a sternotomy on October 31, 2011. This reviewer failed to see any reason she could not have continued to work in a sedentary position from September 8, 2011, until the date of her sternotomy, which was on October 31, 2011. There was lacking documentation of functional limitations in her home environment, such that she could not maintain her usual job duties.
>
> . . . .
>
> Therefore, from September 11, 2011, through October 30, 2011, there was insufficient information in the available records to support time out of work during that time frame or any impairment such that she could not do her usual job duties.

(J.A. at 402-03 (emphasis added).)

Dr. Gerstenblitt submitted an addendum to his initial report to note further attempts to contact Dr. Petrizzi without success. (J.A. at 396-97.) Because he was unable to reach Dr. Petrizzi, he received no new information to alter his initial conclusions. (Id.)

Wells Fargo also referred Harrison's file to an independent physician specializing in general psychiatry, Dr. A. E. Daniel, a Board Certified Doctor in Adult General Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry, to determine whether the medical records supported impairment beyond September 10, 2011. (J.A. at 44-45, 393-95.) Dr. Daniel listed and described the records he reviewed, including letters from Harrison and her sister. (J.A. at 393-94.) Dr. Daniel's review of the medical records showed that Harrison was seen for depression in August 2011 following the death of her husband, had

19

been diagnosed with Anxiety in October 2011, and was referred to a psychologist. (Id.) Dr. Daniel noted that "[w]hile Dr. Petrizzi diagnosed her with Anxiety State, NOS, there is no documented evidence that her anxiety symptoms per se limited her functional capacity." (J.A. at 394.) When contacted by Dr. Daniel, Dr. Petrizzi deferred to Harrison's psychologist. (Id.) This contradicted Harrison's assertion in her letter that Dr. Petrizzi had excused her from work because of depression, anxiety, and PTSD. Dr. Daniel concluded: "The current available medical records forwarded to me do not support impairment from a psychiatric perspective" subsequent to September 10, 2011. (Id.)

On May 4, 2012, Wells Fargo upheld the denial decision rendered by Liberty Life. (J.A. at 391-92.) Wells Fargo explained:

> After review of the STD appeal file, including the independent physician reviews, [Wells Fargo] determined from a physical perspective, as of September 7, 2011 you were fully recovered from your thyroidectomy and evidence based guidelines would support a return to sedentary work by September 11, 2011. From a psychiatric perspective, the medical records on file do not support impairment beyond September 10, 2011.
>
> You underwent a thyroidectomy from an ENT physician on August 17, 2011. However, by September 7, 2011, or three weeks postoperatively, it appeared that the ENT physician only indicated follow up as needed. Evidence based guidelines recommend a return to sedentary work by 14 days postoperatively from a thyroidectomy. The medical records do not indicate ongoing impairment that would preclude your ability to perform your job between September 11, 2011 and the date of your sternotomy on October 31, 2011.

> While Dr. Petrizzi diagnosed you with Anxiety State, NOS, there is no documented evidence that your anxiety symptoms limited your functional capacity. In the absence of psychiatric/psychological records, impairment from a psychiatric perspective is not supported.

(Id.)

## IV.  STANDARD OF REVIEW

In reviewing the District Court's grant of summary judgment, this Court examines the decision *de novo*, applying the same legal standards applied by the District Court. *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). "A federal court's ability to review a discretionary decision of the administrator of an employee benefits plan is significantly limited." *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999). Because the Plan gives the Plan Administrator the "full discretionary authority to administer and interpret" the Plan and resolve benefit claims, (J.A. at 504), Wells Fargo's decision cannot be overturned unless it is an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114 (1989).

Under this deferential standard, the denial decision should not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently. *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008). The decision of an administrator or fiduciary is reasonable if it "'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Brogan*, 105 F.3d at 161 (*quoting*

21

*Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995)). Substantial

evidence "is evidence which a reasoning mind would accept as sufficient to

support a particular conclusion. It consists of more than a mere scintilla of

evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*,

368 F.2d 640, 642 (4th Cir. 1966).

## V. SUMMARY OF THE ARGUMENT

The administrative record establishes that Harrison is not entitled to benefits

beyond what she was previously awarded because she was able to work in her

sedentary position of Online Customer Service Representative following her

recovery from her thyroidectomy and, therefore, failed to establish a continued

disability as required under the Plan. Wells Fargo reached this conclusion after

conducting a complete review of Harrison's medical records, statements and

assessments from Harrison, her sister and her doctors, reviews performed by a

nurse case manager, and two separate independent peer reviews performed by

board-certified doctors. Analysis of the factors outlined by this Court in *Booth v.*

*Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th

Cir. 2000), demonstrates the reasonableness of the denial decision. The totality of

medical and vocational information failed to support Harrison's continued claim

for short-term disability benefits, and the denial decision was reasoned, principled,

and supported by substantial evidence.

Harrison challenges the reports from the independent peer reviewers, arguing they overlooked some information and failed to obtain other information. The administrative record shows, however, that these independent physicians fully reviewed, analyzed, and considered Harrison's complete file, attempted to contact her treating physician for peer-to-peer consultation, and issued well-reasoned, supported, and unbiased conclusions. It was reasonable for Wells Fargo to rely on the conclusions of the independent peer reviewers and Harrison's medical records over the conflicting subjective complaints from Harrison and the conclusory, unsupported, and sometimes conflicting opinions from Harrison's treating physician.

Finally, in support of her argument that Wells Fargo failed to obtain records from Harrison's psychologist, Harrison and the Department of Labor urge the Fourth Circuit to adopt the Tenth Circuit's reasoning in *Gaither v. Aetna Life Insurance Company*, 394 F.3d 792 (10th Cir. 2004). The Fourth Circuit, however, has repeatedly found no obligation on the part of the plan administrator to secure evidence supporting a claim of disability. *See, e.g.*, *Elliott*, 190 F.3d at 608; *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir. 1985), *abrogated on other grounds by Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989); *LeFebre v. Westinghouse Elec. Corp. Mgmt. Disability Benefits Plan*, 747 F.2d 197, 206 (4th Cir. 1984), *overruled by implication on other grounds by Black & Decker*

*Disability Plan v. Nord*, 538 U.S. 822 (2003). Additionally, *Gaither* is distinguishable from this case, where Harrison raised a potential basis for a disability for the first time during the appeals process, Liberty Life told her that it lacked any medical records supporting the newly raised disability, Liberty Life encouraged her to provide documentation on appeal, Liberty Life gave her repeated chances to provide such documentation, Harrison failed to provide such documentation, and Harrison informed the administrator that records from all treating physicians had been provided.

## VI. ARGUMENT

Wells Fargo's denial of benefits after September 10, 2011 resulted from a deliberate, principled reasoning process. Over the course of two appeals, Liberty Life and Wells Fargo conducted full reviews of Harrison's medical records and related materials, referred her file to a NCM for review on two occasions, arranged for two independent peer reviews by board-certified experts in internal medicine and psychiatry, and considered Harrison's job description and requirements. Harrison had the opportunity to supply whatever information she deemed relevant throughout both appeals. Harrison could have returned to work between September 11th and October 30th. If appropriate, she could have submitted a new claim for any period of short-term disability resulting from this second surgery, but it was not permissible for her to remain out of work and seek benefits for this

24

seven-week period—a period during which she could have performed her regular job-duties. (J.A. at 479, 482.)

In *Booth*, the Court listed the following eight nonexclusive factors to consider in determining the reasonableness of an administrator's discretionary decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000). Analysis of these factors, as set forth below, demonstrates the reasonableness of Wells Fargo's decision.[7] Accordingly, the District Court's award of summary judgment should be affirmed.

## A.    The Denial Decision is Supported by the Plan Language

The Plan language supports the denial decision. Harrison has the burden of demonstrating that she suffered from a medically certified health condition that

---

[7] Harrison does not claim that the denial decision was inconsistent with earlier interpretations of the Plan and does not identify any external standard relevant to the exercise of discretion. This analysis does not, therefore, address those two *Booth* factors.

<u>prevented her from performing the essential duties of her sedentary job</u> to remain qualified for short-term disability benefits.  (J.A. at 480.)  Those benefits were properly terminated once her condition no longer prevented her from performing her job duties.

Harrison challenges the denial decision by pointing to the fact that Wells Fargo granted her short-term disability benefits prior to September 11, 2011, asserting that this means that Wells Fargo could not later terminate them.  This argument ignores the obvious:  usually when people get sick, they get better.  The fact Wells Fargo initially granted her benefits does not preclude a subsequent termination of those benefits once her condition improves.  This Court flatly rejected this overly simplistic argument:

> [T]he fact that [a plan administrator] initially awarded benefits to [a claimant] does not mean that its subsequent termination of those benefits was the result of unprincipled reasoning. . . .  The Fourth Circuit has held that no vested right to benefits accrues under an employee welfare benefits plan so that the decision to grant benefits initially cannot create an obligation by which a plan fiduciary is estopped from later terminating benefits.

*Hensley v. Int'l Bus. Machines Corp.*, 123 F. App'x 534, 538 (4th Cir. 2004) (*citing Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994)) (internal quotations omitted).

Here, Harrison's circumstances changed between the initial decision awarding benefits and the date when those benefits terminated.  In between, she

had a successful operation. The medical records demonstrated that her condition had improved, and her treating physicians released her to follow-up as needed, and provided no restrictions or limitations with which to comply. Consistent with the terms of the Plan, Wells Fargo required Harrison to present evidence of a continued disability and denied her benefits when the evidence demonstrated instead that she could return to work.

Harrison also claims it was improper for Wells Fargo to require clinical evidence that she was unable to do her job. According to Harrison, Wells Fargo may only require clinical evidence to determine the existence of a medical condition. She argues it is improper to require that medical professionals go the next step and actually opine that the medical condition renders the claimant unable to work. Under Harrison's interpretation of the law, once a medical condition is established through clinical evidence, the claimant is automatically entitled to benefits simply by making subjective complaints of pain and limitations.

Harrison's interpretation of the Plan language is incorrect. The Plan requires clinical evidence of a medical condition and proof that the condition renders the participant unable to work. Clinical evidence that a claimant suffers from a medical condition by itself is inadequate to obtain disability benefits. While a claimant is free to submit subjective complaints and testimonial evidence, the Plan is free to consider and weigh that evidence in light of the medical records. The

27

Plan does not abuse its discretion by asking treating physicians or peer review physicians to explain how and whether a certain condition translates into work-related restrictions or limitations. Courts and lawyers may be ill-equipped to understand complex medical terminology and determine how a condition impacts a person's ability to perform his or her job without guidance from medical professionals.[8] Additionally, relying exclusively on a claimant's opinion of whether he or she can work opens the door to potential fraud and abuse.

**B.    The Denial Decision Furthers the Purposes and Goals of the Plan**

Wells Fargo established the Plan to provide employees "with salary replacement if [they] had a medically certified health condition and are unable to perform some or all of [their] job duties." (J.A. at 477.) Here, Wells Fargo denied Harrison continued benefits because she could perform her job duties. Thus, the denial decision furthers the purposes and goals of the Plan. To provide her further benefits when she no longer qualified for them would have been inconsistent and detrimental to the purposes and goals of the Plan. As recognized by this Court, the plan administrator "must serve the best interests of all Plan beneficiaries, not just the best interest of one potential beneficiary." *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 234 (4th Cir. 1997), *abrogated in part on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

---

[8] Harrison has included charts and translated medical terminology into layman's terms in her brief, presumably for this very reason.

28

### C. The Materials Considered by Liberty Life and Wells Fargo Were Adequate and Supported the Denial Decision

#### 1. The Medical Records Supported the Denial Decision

Wells Fargo reasonably concluded that Harrison had recovered sufficiently from her thyroidectomy to perform the essential functions of her sedentary job as of September 11, 2011. This decision was supported by substantial evidence. Harrison underwent a successful total thyroidectomy in mid-August 2011. The standard recovery period from such an operation is two weeks. Harrison attended two post-operative visits with her surgeon after her operation, during which her surgeon noted that her symptoms had improved. In the first visit he observed her post-operative pain was "moderate." In the second visit, it was "mild" – an obvious improvement. The surgeon then released Harrison to Dr. Petrizzi, her primary care physician. (J.A. at 148-51, 169-70.) Her surgeon did not specify a single restriction on Harrison's ability to return to work.

Approximately three weeks after her thyroidectomy, Harrison saw Dr. Petrizzi and complained primarily about her minor shoulder pain. Dr. Petrizzi told her to perform at-home physical therapy. (J.A. at 142-44.) Harrison did not complain of chest pain. (Id.) The next appointment with Dr. Petrizzi occurred approximately one month later, after Liberty Life had denied Harrison additional benefits. (J.A. at 121-23.) Harrison described the purpose of her October visit as follows:

29

Patient words:  PT needs updated STD forms; PT states her STD has been denied because of the wording of our last form filled out—she will also need[] a written letter from us explaining why she should not have been denied; explaining her current medical conditions.

(J.A. at 121.)

Other evidence considered by Wells Fargo at the time it denied Harrison's benefits fully supports the decision.  This evidence included:

1)  a normal heart rhythm test;

2)  a normal chest scan with surgery scheduled for the thyroid nodule;

3)  no further work-ups for reported chest pain;

4)  no further complaints of right shoulder issues as of October 5, 2011;

5)  normal mental status exam findings; and

6)  normal physical and nervous findings.

Simply put, the medical records fully supported the decision that Harrison was capable of performing her sedentary job following her recovery from her thyroidectomy on September 11, 2011.  The period of recovery was consistent with Harrison's original estimated return to work date of two-weeks' post-operation, and consistent with the standard recovery period for a thyroidectomy.  (J.A. at 41.) The independent peer reviewer, Dr. Gerstenblitt, also found this recovery time adequate for Harrison.  (J.A. at 402-03.)

While Harrison repeatedly makes the conclusory statement that she was not capable of performing the essential functions of her job as of September 11, 2011, she fails to identify how her health condition impaired her ability to perform any specific job duty. Additionally, the cases cited by Harrison for the proposition that her condition had not sufficiently improved to allow her to return to work are entirely distinguishable as they involve claimants suffering from long-standing, degenerative conditions. *See, e.g., Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 833 (7th Cir. 2009) (finding substantial evidence that the claimant suffered from a debilitating and degenerative condition requiring seventeen surgeries and procedures over the last twenty years).

The medical records similarly provided no support for Harrison's contention that she was disabled due to depression, anxiety or post-traumatic stress disorder. Her mental status exam findings were normal throughout her treatment. Dr. Petrizzi listed no work-related restrictions resulting from Harrison's psychiatric condition. While it appears that Harrison was referred to a psychologist, Dr. Glenn, there is no evidence that she had even seen him when she filed her appeal in October 2011, and she provided no documentation from Dr. Glenn to support her claim of disability. Instead, in December 2011, Harrison claimed that Dr. Petrizzi had concluded she was unable to work because of her mental state. Dr. Petrizzi contradicts Harrison, explicitly stating he deferred treatment for her psychiatric

31

conditions to Dr. Glenn. Wells Fargo's decision that Harrison had not presented sufficient information to demonstrate any mental impairment makes perfect sense in light of these inconsistencies and finger pointing between Harrison and Dr. Petrizzi.

### 2. Wells Fargo Properly Considered and Weighed the Opinions of Harrison's Treating Physician

The decision to deny Harrison benefits is not unreasonable simply because it differs from the opinions of her treating physician, particularly when his opinions are unsupported by the medical evidence. *See Nord*, 538 U.S. at 834 ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). Liberty Life and Wells Fargo were not required to adopt blindly the opinions of Dr. Petrizzi, and did not act in an arbitrary and capricious manner simply by rejecting his unsupported opinions. *Tickle v. Long Term Disability Plan of Marathon Ashland Petroleum*, 34 F. App'x 909, 913 (4th Cir. 2002) ("In this case, as we have already noted, there is no evidence that the treating personnel relied on any objective testing in reaching their conclusions.").

It also bears noting that Dr. Petrizzi initially concluded that Harrison should remain out of work only until the completion of her surgery, which occurred on

32

August 17, 2011. (J.A. at 192.) He then changed his opinion after Harrison had told him her disability benefits had been terminated and she needed a letter from him to reinstate them. (J.A. at 121, 123.) Additionally, Wells Fargo's peer review doctor solicited Dr. Petrizzi for peer-to-peer review, but Dr. Petrizzi did not avail himself of the opportunity to present additional information on Harrison's behalf. The reviewing physicians and Wells Fargo considered the opinions of Harrison's treating physician, but eventually gave them less weight because of the lack of supporting objective evidence. *See Scott v. Eaton Corp. Long Term Disability Plan*, 454 F. App'x 154, 160 (4th Cir. 2011).

### 3. Wells Fargo Properly Considered and Weighed Statements from Harrison and Her Sister

Harrison argues that Wells Fargo inserted an evidentiary hurdle into the process that is impermissible by requiring her to produce objective evidence of disability. This misstates what transpired. Wells Fargo permitted Harrison to introduce subjective evidence, and considered every piece of it, including letters from Harrison and her sister, but did not give it the same weight as objective clinical evidence, which was within its prerogative.

Harrison submitted two letters in support of her appeal. In one letter, Harrison herself claimed she was unable to drive or focus because of her chest pain, that she sporadically experiences numbness in her arm and fingers, and that

she is unable to work due to emotional trauma. (J.A. at 134.)[9] In a second letter, Harrison describes her recovery and restrictions following her October 31, 2011 median sternotomy. (J.A. at 59.) These complaints provide no support for any functional limitations between September 11, 2011 and October 31, 2011.

The letter from Harrison's sister states that she had to assist Harrison with various functions and that Harrison could not drive because of medications. (J.A. at 61.) The letter does not explain when she had to assist Harrison with the listed functions or why Harrison was unable to perform those functions by herself. Harrison's medical records do not restrict her from performing such functions. Both Dr. Gerstenblitt and Dr. Daniel refer to Harrison's and her sister's letters in their reports. They did not overlook them, and Wells Fargo did not act unreasonably in finding these vague and conclusory statements insufficient to counter the medical records and other evidence supporting a finding of no disability subsequent to September 10, 2011.

### 4. The Reports from the Independent Peer Reviewers Provide Further Support for Wells Fargo's Denial Decision

In making its denial decision, Wells Fargo also relied on reports from two independent peer reviewers who found that the documentation in Harrison's file

---

[9] Her medical records, however, do not contain any restrictions on her driving and do not mention any complaints about an inability to focus or numbness. Considering that she failed to report these symptoms or problems to her treating physicians, Wells Fargo did not act unreasonably in giving little weight to these complaints.

did not support any impairment preventing Harrison from performing her job duties beyond September 10, 2011. Harrison's simple disagreement with the independent peer reviewers' conclusions is insufficient to demonstrate that they were "flawed" such that reliance on those reports rendered the denial decision an abuse of discretion.

Dr. Gerstenblitt conducted a full and fair review of Harrison's file. He described in detail the records he reviewed, including the letters submitted by Harrison and her sister. (J.A. 399-401.) He attempted to contact Dr. Petrizzi for a peer-to-peer consultation on multiple occasions without a response. (J.A. at 396-97, 401-02.) Despite Harrison's contention otherwise, Dr. Gerstenblitt does not equivocate his opinions. He clearly states that Harrison "should have been able to go back to work as of September 8, 2011" (J.A. at 402 (emphasis added)) and that "there was insufficient information in the available records to support . . . any impairment such that she could not do her usual job duties" subsequent to September 10, 2011. (J.A. at 403.) His statement that "chest pain is not a reason necessarily to be unable to work" demonstrates he considered Dr. Petrizzi's letters, but nevertheless reaches a different, rational, and reasonable conclusion. (Id.) Chest pain can be severe or mild. It can be persistent or sporadic. It might be something which can be controlled through medication.

Harrison's unsupported claims of bias on the part of Dr. Gerstenblitt should also be rejected. Relying on nothing more than deposition testimony from another case and unrelated caselaw, Harrison argues that Wells Fargo acted unreasonably in retaining Dr. Gerstenblitt because he allegedly received the majority of his income from defense referrals seven years ago. (J.A. at 509-19.) Importantly, Harrison cites to two cases which were critical of Dr. Gerstenblitt, but many other courts have endorsed his opinions. *See, e.g., Tuttle v. CIGNA Grp. Ins.*, Cause No. 1:10cv202-LG-RHW, 2012 U.S. Dist. LEXIS 47500, at *27 (S.D. Miss. Apr. 4, 2012) (finding denial of benefits reasonable where the administrator relied in significant part on a report prepared by Dr. Gerstenblitt); *Schnur v. CTC Cmmc'ns Corp. Grp. Disability Plan*, No. 05 Civ. 3297 (RJS), 2010 U.S. Dist. LEXIS 31282, at *41 (S.D.N.Y. Mar. 29, 2010), *aff'd*, 413 F. App'x 377 (2d Cir. 2011) (finding Dr. Gerstenblitt's report "well reasoned"); *see also Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090, 1096 (C.D. Cal. 2009), *aff'd*, 409 F. App'x 99 (9th Cir. 2010) (finding denial of benefits reasonable when based in part on report from Dr. Gerstenblitt); *Meyer v. Life Ins. Co. of N. Am.*, No. 08-10-HRW, 2009 U.S. Dist. LEXIS 8586, at *8 (E.D. Ky. Feb. 5, 2009) (same); *Trottier v. CNA Grp. Life Assurance*, No. 03-544-SM, 2004 U.S. Dist. LEXIS 23927, at *10-11 (D.N.H. Nov. 29, 2004) (same). There is literally no evidence of bias by Dr. Gerstenblitt here, and no mistake was committed by Wells Fargo in

36

relying on his report.[10]  *Cf. Abromitis v. Cont'l Cas. Co./CAN Ins. Cos.*, 114 F.

App'x 57, 61 (4th Cir. 2004) (finding evidence as to a reviewing physician's

conflict of interest irrelevant in an ERISA case).

Similarly, Dr. Daniel conducted a comprehensive review of Harrison's file.

He listed and described the records he reviewed, including letters from Harrison

and her sister.  (J.A. at 393-94.)  He contacted Dr. Petrizzi, who deferred

Harrison's psychiatric status to her psychologist.  This contradicted Harrison, who

claimed that Dr. Petrizzi had excused her from work because of her mental state.

Harrison also argues that Dr. Daniel's and Dr. Gerstenblitt's reports are

inherently flawed because they did not personally examine Harrison.  This Court

has repeatedly upheld benefit denials based on independent file reviews.  *See, e.g.,*

*Evans*, 514 F.3d at 325 (holding that the plan administrator's assessment of the

evidence was fair, well-reasoned, and entitled to deference and finding that the

district court improperly reweighed the evidence by concluding that the examining

physicians were more persuasive than the reviewing physicians); *Ellis*, 126 F.3d at

233-34 (finding that a plan administrator's decision was reasonable in part because

it was based on three separate reports from independent physicians); *see also Scott*

---

[10] Harrison argues that the Supreme Court has recognized that a "consultant
engaged by a plan may have an 'incentive' to make a finding of 'not disabled.'"
*Nord*, 538 U.S. at 832.  The Supreme Court went on the say that "so a treating
physician, in a close case, may favor a finding of 'disabled.'"  *Id.*

*v. Eaton Corp. Long Term Disability Plan*, 454 F. App'x 154, 159 (4th Cir. 2011); *Frankton v. Metro. Life Ins. Co.*, 432 F. App'x 210, 216 (4th Cir. 2011); *Spry v. Eaton Corp. Long Term Disability Plan*, 326 F. App'x 674, 680 (4th Cir. 2009); *Hale v. Broadspire Servs.*, 232 F. App'x 278, 279-80 (4th Cir. 2007).  The Supreme Court has also rejected the argument that doctors who physically examine patients should be entitled to special deference in ERISA cases.  *Nord*, 538 U.S. at 831.

> ### 5. Wells Fargo's Review Cannot Be Rendered Inadequate Simply Because Harrison Failed to Avail Herself of the Opportunity to Provide Records from Dr. Glenn

In a related argument, Harrison and the Department of Labor contend that Wells Fargo deprived Harrison of a "full and fair" review because it did not affirmatively contact Dr. Glenn to obtain his medical records or advise Harrison that it did not possess these records.  In making this argument, they ignore the Plan language, contradict controlling Fourth Circuit law, and distort the facts.

The Plan clearly places the burden on Harrison to provide medical documentation for review on appeal.  She must prove she is disabled, and it was her responsibility to "include any medical documentation that you would like to be considered in the denial review."  (J.A. at 485; see also J.A. at 486 ("*It is very important that you submit all of the information you want reviewed when your appeal is filed*.").)

Wells Fargo gave Harrison multiple opportunities to supplement the record with any documents from Dr. Glenn, but she repeatedly declined to do so. When she first mentioned emotional and mental issues as a potential basis for disability after the initial denial, Liberty Life informed her that it had no records to support any such impairment and that she could submit any additional medical documentation on appeal. (J.A. at 32.) Harrison indicated she understood the importance of supplying the records she was relying upon to Liberty Life and, further stated at that time that her treatment was coming from Dr. Petrizzi, not Dr. Glenn. (J.A. at 32, 134.) The initial denial decision also instructed that any request for review should include "any other medical information from all treating providers, which you feel will support your claim for continued benefits." (J.A. at 139-40 (emphasis added).) It does not appear that Dr. Glenn was even in the picture at this time.

After receiving Harrison's appeal, Liberty Life contacted her twice. The first time, Liberty Life asked if Harrison had provided all relevant information from all of her health providers. (J.A. at 31.) Harrison informed Liberty Life that the information would be forthcoming. (Id.) Liberty Life contacted Harrison again once it received medical records, and Harrison verified that Liberty Life now had all the information to process the appeal. (Id.) Harrison submitted additional records from Dr. Petrizzi and new records from Dr. Hollings, but failed to provide

39

any medical documentation from her psychologist. Again, it does not appear that Harrison had even sought treatment from Dr. Glenn at this juncture.

Similarly, she failed to submit any documentation from Dr. Glenn on her second-level appeal even though she was informed that the medical information currently available did not substantiate her claims of impairment and that she could "submit any additional information or comments you deem pertinent for review." (J.A. at 93.)

In summary, the administrative record conclusively shows that Harrison knew Wells Fargo did not have records from Dr. Glenn, Harrison understood how to submit additional medical records and she did so more than once, Liberty Life gave her the opportunity to supplement the record on numerous occasions, and she even informed Liberty Life that she had provided relevant records for all treating providers. "Having failed to submit supplemental . . . information [from Dr. Glenn], [Harrison] cannot now prevail on an argument that [Wells Fargo] had insufficient evidence to make a reasoned decision." *Elliott*, 190 F.3d at 608. Indeed, it is far from clear that there were any records to consider from Dr. Glenn.

The Fourth Circuit has repeatedly found that a plan administrator has no duty to secure evidence on behalf of a claimant under similar circumstances. *Elliott*, 190 F.3d at 608 (finding no obligation on the part of the plan administrator to secure evidence supporting a claim of disability where the record contained

40

substantial evidence supporting denial and the claimant was free to supplement the record on appeal); *Berry*, 761 F.2d at 1008 (finding that the plan administrator had no duty to secure evidence supporting a claim for disability benefits where it possessed reliable evidence that claimant was not disabled); *LeFebre*, 747 F.2d at 206 (finding no obligation to seek evidence supporting disability where the plan administrator provided claimant with the opportunity to submit any additional information or medical records and reopened the claim to consider such additional records).

Despite this Fourth Circuit precedent, Harrison and the Department of Labor urge the Court to adopt the Tenth Circuit's reasoning in *Gaither*. In *Gaither*, the administrator failed to recognize the nature of the claimant's alleged disability prior to rendering a decision. 394 F.3d at 806. The court found that the administrator had "rejected the claim without a substantial basis for doing so, without following up on obvious leads, and apparently without specifically considering the claim at all." *Id.* The court asserted the "narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute the theory." *Id.* at 807 (emphasis added). The *Gaither* court did not hold "that the administrator must pour over the record for possible bases for

41

disability that the claimant has not explicitly argued, or consider whether further inquiry might unearth additional evidence when the evidence in the record is sufficient to resolve the claim one way or the other." *Id.*

*Gaither* is factually distinguishable. In this case, Wells Fargo understood the nature of Harrison's alleged disability and had a substantial basis for rejecting her claim. It fully investigated her claim, reviewed the entirety of her file, and referred her records to a NCM and two independent physicians for review. Wells Fargo did not shut its eyes to readily-available information. It provided Harrison with numerous opportunities to supplement the record with any additional relevant materials and she in fact furnished more information to Wells Fargo, which it considered. It appears that records from Dr. Glenn did not exist during the relevant time frame, and Harrison instead submitted records from Dr. Petrizzi and Dr. Hollings. With these facts, the Tenth Circuit would find that Wells Fargo did more than enough. *See, e.g., Benson v. Hartford Life & Accident Ins. Co.*, 511 F. App'x 680, 686 (10th Cir. 2013) (finding the plan administrator was under no duty to seek out additional records where it had evidence to refute the claimant's assertions of disability and provided the claimant with the opportunity to appeal the decision and present additional medical records for consideration); *Rizzi v. Hartford Life & Accident Ins. Co.*, 383 F. App'x 738, 754 (10th Cir. 2010) (finding the plan administrator was under no duty to further investigate claimant's allegations of

42

depression first raised on appeal where medical records never suggested that depression was debilitating or a separate issue worthy of consideration).

The additional decisions cited by Harrison and/or the Secretary are similarly distinguishable and unpersuasive in this case. In *Harden*, the Eighth Circuit ruled that the plan administrator inappropriately failed to "obtain and consider the Social Security records, after leading [the claimant] to believe that it would." *Harden v. Am. Express Fin. Corp.*, 384 F.3d 498, 500 (8th Cir. 2004). The court limited its holding "to the facts of th[e] case where the plan administrator led the claimant to believe that certain medical records were being considered when they were not." *Id.* Here, there was no deception. Wells Fargo asked Harrison to provide any records she wanted it to consider and never misled her in any way.

In *Booton*, the Ninth Circuit held that a plan administrator acted unreasonably in failing to explain its denial decision and failing to seek medical records described by a treating physician as supportive of his opinion that the plaintiff was disabled. *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463-64 (9th Cir. 1997). Again, in Harrison's case, the record suggests that Harrison was not yet seeing Dr. Glenn as of October 2011 and that Dr. Petrizzi, not Dr. Glenn, had taken her out of work as of December 2011. Unlike the physician in *Booten*, Dr. Petrizzi did not identify or describe specific medical records from Dr. Glenn as supportive of his opinion that Harrison was unable to return to work.

43

In *Kunin*, the Ninth Circuit reversed a plan administrator's denial of a claim where it made no effort to consult with the treating physician, failed to provide any information about the doctors with whom it did consult, and relied on evidence that actually supported the plaintiff's claim for disability. *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 538 (9th Cir. 1990). Similarly, in *Quinn*, the Eight Circuit found substantial evidence lacking where the decision-maker admitted it did not know the claimant's job duties in rendering its denial decision. *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998). Together, those cases stand for the proposition that a denial must be supported by substantial evidence and well-reasoned. Wells Fargo has met this standard.

### D.    The Decision-Making Process Was Reasoned and Principled

The Plan has two levels of appeal. The first appeal is perfected to Liberty Life. The second appeal is sent to a different entity, Wells Fargo & Company. Harrison had the ability to supply information in support of her claims throughout both appeals. Wells Fargo appointed a nurse case manager and two independent physicians to review the relevant information. This entire process was fair, holistic, robust and "comport[s] with those [the Fourth Circuit] has previously found to be deliberate and principled." *See, e.g., Donnell v. Metropolitan Life Ins. Co.*, 165 F. App'x 288, 294-95 (4th Cir. 2006); *Hensley*, 123 F. App'x at 538; *Booth*, 201 F.3d at 344-45.

Harrison argues the appeals process was somehow inadequate because Wells Fargo did not require her to undergo an independent medical exam. This Court has never required a plan administrator to seek such an examination. The use of board-certified experts in their field to conduct a thorough peer review is a widely-accepted approach. *Davis v. Unum Life Ins. Co*, 444 F.3d 569, 577 (7th Cir. 2006) (finding independent peer reviews sufficient because "doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations."); *see also Scott*, 454 F. App'x at 159; *Frankton*, 432 F. App'x at 216; *Spry*, 326 F. App'x at 680; *Evans*, 514 F.3d at 325; *Hale*, 232 F. App'x at 279-80; *Ellis*, 126 F.3d at 233-34.

Harrison next asserts Wells Fargo parsed the record and cherry-picked helpful facts while ignoring others. The administrative record demonstrates that Wells Fargo completed a full and fair review of her entire file. After this review was complete, Wells Fargo determined that the record as a whole did not support any impairment preventing Harrison from performing her duties after September 10, 2011.

### E.     The Decision Was Consistent with the Procedural and Substantive Requirements of ERISA

Wells Fargo's denial decision was consistent with the procedural and substantive requirements of ERISA. In analyzing this *Booth* factor, "substantial compliance with the spirit of the regulation will suffice, for 'not all procedural defects will invalidate a plan administrator's decision.'" *Ellis*, 126 F.3d at 238 (*quoting Brogan*, 105 F.3d at 165). "Substantial compliance exists where the claimant is provided with 'a statement of the reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review.'" *Id.* (*quoting Brogan*, 105 F.3d at 165).

The denial letters Wells Fargo provided to Harrison complied with ERISA's procedural and substantive requirements. They informed her of the reasons for denial, quoted relevant portions of the Plan language, informed her of evidence relied on in reaching the conclusion, explained her appeal rights, and notified her that she could submit additional documentation for review. This is exactly what the regulation requires and exactly what Wells Fargo did. "In all material respects, [Wells Fargo] substantially complied with each of the ERISA regulation requirements." *Id.*

The Department of Labor contends that Wells Fargo had to provide a detailed description of the additional information needed to obtain disability benefits under 29 C.F.R. § 2560.503-1(g)(1)(iii), which requires the plan

46

administrator to provide the claimant with "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."  Presumably, once Wells Fargo asked Harrison (twice) for all of her supporting medical records, the Department of Labor would have required Wells Fargo to cross check what it received from Harrison against the name of every doctor ever mentioned by her.  If there were holes in the information, the Department of Labor would require Liberty Life to go back to Harrison a third time and list by name those doctors whose reports were not provided, or solicit those doctors directly for their records.  Anything short of that would apparently not satisfy the Department of Labor.

This Court has correctly rejected this approach.  In *Ellis,* this Court found that § 2560.503-1(g)(1)(iii) applied only when a claimant had not yet perfected his or her claim, meaning the administrator had not yet rendered a decision in his or her case.  *Id.*  The *Ellis* court rejected the notion that "[the plan administrator] is under an obligation to inform [the claimant] of what she needs to tell [the plan administrator] in order to obtain disability benefits."  *Id.*  The Court explained: "That is not [the plan administrator's] role as a fiduciary.  [The plan administrator] must treat each claimant with procedural fairness, but, because it must also guard against improper claims, it is not his duty to affirmatively aid claimants in proving their claims."  *Id.*

47

Similar to the claimant in *Ellis*, Harrison did not need to submit any further information to perfect her claim. Instead, her claim was already complete and the claims administrator had rendered a decision in her case. Section 2560.503-1(g)(1)(iii) does not require Wells Fargo to identify exactly what Harrison must provide to obtain a reversal of the denial decision.

### F.    Any Conflict of Interest Had No Effect on the Decision

The Supreme Court held in *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105 (2008), that the courts must use the traditional and deferential arbitrary and capricious standard of review when a plan is funded and administered by the same entity. The plan administrator's conflict of interest should be viewed "as but one factor among the many identified in *Booth* for reviewing the reasonableness of a plan administrator's discretionary decision." *Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622, 631 (4th Cir. 2010).

The administrative record demonstrates that Wells Fargo took numerous steps to ensure an accurate claim assessment and eliminate the risk of any potential bias caused by a conflict of interest. Liberty Life initially processed and handled Harrison's claim, including her first-level appeal. On the second-level appeal, Wells Fargo retained two independent physicians to review Harrison's file. Wells Fargo took these steps to protect the integrity of its decision-making process, and Harrison has not produced any evidence suggesting that any conflict of interest had

48

an impact on Wells Fargo's denial decision. *Fortier v. Principal Life Ins. Co.*, 666 F.3d 231, 236 n.1 (4th Cir. 2012) ("Absent any evidence in the record that [the plan administrator's] denial of benefits was a product of its financial interest, rather than its genuine and reasoned judgment, we can hardly place determinative weight on that factor in reviewing the administrator's decision.").

## VII. CONCLUSION

Wells Fargo faithfully adhered to the obligations under ERISA and the terms of the Plan in administering this claim. Its decision to deny Harrison short-term disability benefits after September 10, 2011 was well-reasoned and supported by substantial evidence. For the foregoing reasons, Wells Fargo respectfully requests that the Court affirm the District Court's grant of summary judgment.

## REQUEST FOR ORAL ARGUMENT

Appellees request oral argument.

Dated:        April 28, 2014

Respectfully Submitted,

_____/s/_____Summer L. Speight_____
Dana L. Rust (VSB# 28408)
Summer L. Speight (VSB# 80957)
McGuireWoods LLP
901 East Cary Street
Richmond, Virginia 23219
(804) 775-1000
(804) 775-1061 (fax)

Counsel for Appellees Wells Fargo Bank,
N.A. & Wells Fargo & Company Disability
Plan

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:

- This brief contains 11,614 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface and type style requirements of Fed. R.

App. P. 32(a)(5) because:

- This brief has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft word.

_____/s/ Summer L. Speight_____
Summer L. Speight

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2014, I will electronically file the foregoing Appellees' Response Brief with the Clerk of this Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Richard F. Hawkins, III
The Hawkins Law Firm PC
2222 Monument Avenue
Richmond, Virginia  23220
(804) 308-3040
(804) 308-3113 (fax)
rhawkins@thehawkinslawfirm.net

G. William Scott
scott.william@dol.gov
Elizabeth Hopkins
hopkins.elizabeth@dol.gov
Gail Perry
perry.gail@dol.gov
U.S. Department of Labor
P.O. Box 1914
Washington, D.C. 20210
(202) 693-5595

_____/s/ Summer L. Speight_____
Summer L. Speight